Opinion filed June 11, 2009











 
 
  
 
 







 
 
  
 
 




Opinion filed June 11,
2009

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh
Court of Appeals

                                                                 ____________

 

                                                          No. 11-07-00317-CV 

                                                    __________

 

                                   ANNETTE MCCARTY, Appellant,

 

                                                             V.

 

               CLINTON T.
MONTGOMERY, AS MANAGING TRUSTEE 

              OF THE
TRIMONT IRREVOCABLE TRUSTS, AND ELTON

                                         MONTGOMERY,
Appellees

 



 

                                          On
Appeal from the 29th District Court

 

                                                      Palo
Pinto County, Texas

 

                                                  Trial
Court Cause No. C41088

 



 

                                                                   O
P I N I O N

 








 This
is a real estate contract dispute.  Clinton T. Montgomery, as managing trustee
of the Trimont Irrevocable Trusts (Trimont), sued Annette McCarty seeking
specific performance.[1]  McCarty
responded with a counterclaim against Trimont and a third-party claim against
Elton  Montgomery alleging breach of contract and tort claims.  The trial court
granted Trimont=s and
Elton Montgomery=s
motions for summary judgment and subsequently entered a final judgment in their
favor.  We affirm.

                                                             I. 
Background Facts

McCarty
agreed to sell to Elton Montgomery an undivided one-half interest in a
950.3-acre tract in Palo Pinto County for $200,000.  The parties utilized a
Texas Real Estate Commission form, TREC No. 25-4, to document their agreement.[2] 
Montgomery deposited $2,500 in earnest money with Palo Pinto County Abstract
Company and assigned the contract to Trimont and Ray Herring.  Herring
subsequently assigned his interest to Trimont.  For convenience, we will refer
to Montgomery rather than Trimont as the contracting party.

The
contract required McCarty to furnish Montgomery with a title policy.  That
title policy was allowed certain enumerated exceptions.[3] 
McCarty was also required to furnish a commitment for title insurance, legible copies
of restrictive covenants, and documents evidencing exceptions in the
commitment.  While preparing a commitment, Palo Pinto County Abstract
discovered that a federal tax lien burdened the property.  The lien arose
because McCarty=s
estranged husband failed to pay income taxes after their separation in 1995. 
McCarty knew that the IRS had filed tax liens on their Brownwood home, but she
did not know that it had filed a lien on her Palo Pinto County property.  The lien
was dated November 5, 1997.  As of that date, the unpaid balance was
$28,676.60, but the lien had grown to approximately $50,000 when discovered by
Palo Pinto County Abstract.








McCarty=s real estate agent, Blake
Hortenstine, asked Palo Pinto County Abstract to wait on the title commitment
until McCarty determined what steps could be taken with regard to the lien. 
Hortenstine also informed Montgomery about the lien and the need for additional
time.  Montgomery filed an affidavit in the real property records of Palo Pinto
County.  The affidavit included a copy of the contract and indicated Montgomery=s belief that he had the
right to insist upon specific performance and his intention to do so.  McCarty
asserted that she did not owe the underlying taxes and that, because the land
was her separate property, it was not subject to the lien.  McCarty also lacked
the funds to pay the taxes and would not receive enough money from the sale of
the property to pay them.  There were some discussions about renegotiating the
contract so that McCarty could pay the lien at closing, but she was adamant in
her refusal to do so.  During her deposition, McCarty testified that, even if Montgomery
had offered her one million dollars, she would not have paid the lien. 
Hortenstine informed Palo Pinto County Abstract that McCarty would not pay the
lien.  Palo Pinto County Abstract=s
owner, Neal Grantham, understood that it would not be paid for issuing a title
commitment and, therefore, one was not issued.

Hortenstine
forwarded Montgomery a letter from McCarty in which she stated: AI need to terminate the
contract because of the situation with the IRS lien that currently clouds the
title.@  Hortenstine
also furnished a signed release allowing Palo Pinto County Abstract to return
Montgomery=s earnest
money deposit.  Montgomery took issue with McCarty=s letter and advised her that the refusal to
discharge the tax lien was Aaltogether
unacceptable.@ He
rejected the offer to return the escrow money and insisted upon proceeding to
closing.  McCarty offered to close with the lien in place, but Montgomery
refused.








McCarty
subsequently executed an oil and gas lease with R.M. Hill Operating, Inc.  This
lease covered a portion of the property that she had earlier contracted to sell
to Montgomery.  When Montgomery learned of this, he contacted her directly and
accused her of criminal misconduct.  McCarty alleges that she later met with
Montgomery and his attorney at a restaurant and that they lied to her to obtain
her signature on an affidavit.  McCarty alleges that Montgomery and his counsel
promised her that they would take the affidavit to Hill Operating and try to
convince it to pay the lien and that, if that failed, they would hire someone
to work on her behalf to see what could be done.  McCarty signed the
affidavit.  That affidavit states that, prior to signing a lease with Hill
Operating, she advised them  that Montgomery had the right to move forward with
the purchase of the land and minerals.  McCarty testified at her deposition
that she understood this meant that Montgomery had the right to move forward at
the time he signed the contract and that she did not realize she was being
asked to sign an affidavit stating that he still had the right to move forward.

McCarty
filed a motion for partial summary judgment arguing that she had no liability
to Trimont under the real estate contract.  Trimont filed a motion for summary
judgment seeking specific performance, and Trimont and Montgomery filed a
traditional and no-evidence motion for summary judgment attacking McCarty=s affirmative claims.  The
trial court granted Trimont=s
and Montgomery=s
motions, including Trimont=s
request for specific performance, and denied McCarty=s motion.  The order provided that a separate
hearing would be held to determine the manner of specific performance.  McCarty
filed for bankruptcy.  The bankruptcy court lifted the stay to allow the
continuation of this litigation.  The trial court held an evidentiary hearing
and awarded Trimont and Montgomery attorney=s
fees of $85,520.50 and conditional attorney=s
fees in the event of an appeal.  The court ordered the sale to proceed B except that the sales
price of $200,000 would now be paid in cash (the original contract included
seller financing), and the court provided a mechanism for the payment and
release of the tax lien out of the sales proceeds.

                                                                       II. 
Issues

 
McCarty alleges that the trial court erred when it granted Trimont=s motion for summary
judgment seeking specific performance, that it erred when it failed to grant
her motion for partial summary judgment, and that it erred when it granted
Trimont and Montgomery=s
motion for summary judgment on her affirmative claims.

                                                        III. 
Analysis

A. 
Standard of Review.

1.  Traditional Motions for Summary Judgment.








The
standard of review for traditional motions for summary judgment is well
settled. Questions of law are reviewed de novo.  St. Paul Ins. Co. v. Tex.
Dep=t of Transp.,
999 S.W.2d 881, 884 (Tex. App.CAustin
1999, pet. denied). To determine if a fact question exists, we must consider
whether reasonable and fair‑minded jurors could differ in their
conclusions in light of all the evidence presented. Goodyear Tire &
Rubber Co. v. Mayes, 236 S.W.3d 754, 755 (Tex. 2007).  We must consider all
the evidence in the light most favorable to the nonmovant, indulging all
reasonable inferences in favor of the nonmovant, and determine whether the
movant proved that there were no genuine issues of material fact and that it
was entitled to judgment as a matter of law. Nixon v. Mr. Prop. Mgmt.
Co., 690 S.W.2d 546, 548‑49 (Tex. 1985).

2.  No-Evidence Motions for Summary Judgment.

No‑evidence
motions are reviewed under the same standard as a directed verdict. King
Ranch, Inc. v. Chapman, 118 S.W.3d 742, 750‑51 (Tex. 2003). 
Accordingly, we review the evidence in the light most favorable to the
nonmovant and disregard all contrary evidence and inferences.  Id.  A
trial court must grant a proper no‑evidence motion for summary judgment
unless the nonmovant produces more than a scintilla of probative evidence to
raise a genuine issue of material fact on the challenged element of the claim. Tex. R. Civ. P. 166a(I).

B. 
Was Trimont Entitled to Specific Performance?

To
determine the parties=
respective rights and obligations, we must interpret their contract.  Texas
courts have developed rules of interpretation to determine a contract=s meaning and canons of
construction to determine its legal effect. The rules of interpretation may be
utilized to determine if an agreement is ambiguous, but the canons of
construction do not apply absent a determination of ambiguity.  Moon
Royalty, LLC v. Boldrick Partners, 244 S.W.3d 391, 394-95 (Tex. App.C Eastland 2007, no pet.); see
also Bruce M. Kramer, The Sisyphean Task of Interpreting Mineral Deeds
and Leases: An Encyclopedia of Canons of Construction, 24 Tex. Tech L. Rev. 1, 110‑11
(1993) (canons such as Aconstrue
against the grantor@
should not replace rational thought when reading a written instrument or be
used if the document=s
language is clear).  Neither party contends that the contract is ambiguous or
is not fully integrated.  We will, therefore, apply the rules of
interpretation.

The
rules of interpretation include:

1. Construe the
agreement as a whole;

 

2.
Give each word and phrase its plain, grammatical meaning unless it definitely
appears that such meaning would defeat the parties= intent;

 

3.
Construe the agreement, if possible, so as to give each provision meaning and
purpose so that no provision is rendered meaningless or moot;

 








4.
Express terms are favored over implied terms or subsequent conduct; and

 

5.
Surrounding circumstances may be considered B
not to determine a party=s
subjective intent B
but to determine the appropriate meaning to ascribe to the language chosen by
the parties.

 

Mark K. Glasser & Keith A. Rowley, On Parol: The Construction and
Interpretation of Written Agreements and the Role of Extrinsic Evidence in
Contract Litigation, 49 Baylor L.
Rev. 657, 664‑82 (1997).

McCarty
alleges initially that the contract terminated pursuant to its own terms. 
McCarty reasons that Montgomery objected when he received a copy of the
tax lien; that she then had fifteen days to cure; and that, because she did
not, his options were to close with the lien in place or terminate the contract
and receive a refund of his earnest money deposit.  Because he refused to waive
his objection and she refused to clear the lien, McCarty contends that the
contract terminated.  McCarty=s
position is based upon the following contract provision:

[6.D.] OBJECTIONS:
Within 10 days after Buyer receives the Commitment, Exception Documents and the
survey,[4] Buyer may
object in writing to (I) defects, exceptions, or encumbrances to title:
disclosed on the survey other than [the permitted exceptions]; disclosed in the
Commitment other than [the permitted exceptions]; (ii) any portion of the
Property lying in the 100 year flood plain as shown on the current Federal Emergency
Management Agency map; or (iii) any exceptions which prohibit the following use
or activity: [none listed].  Buyer=s
failure to object within the time allowed will constitute a waiver of Buyer=s right to object; except
that the requirements in Schedule C of the Commitment are not waived.  Seller
shall cure the timely objections of Buyer or any third party lender within 15
days after Seller receives the objections and the Closing Date will be extended
as necessary.  If objections are not cured within such 15 day period, this
contract will terminate and the earnest money will be refunded to Buyer unless
Buyer waives the objections.

 

Montgomery correctly points out that this provision was not triggered
because it requires the delivery of a commitment and exception
documents.  Montgomery never received a commitment.








Nor
was this provision otherwise triggered by Montgomery=s actions because he was not put to an
election.  When Montgomery was informed of the lien, he made clear his belief
that McCarty was required to clear it, and he insisted that she do so.  This is
not an objection as described in Paragraph 6.D.  Grantham testified that the
tax lien would have been identified on Schedule C as a lien to be paid at
closing.  Thus, with or without any action by Montgomery, the commitment would
have confirmed his position that the lien was McCarty=s responsibility to clear.  Because Montgomery
was not put to an election, the contract did not terminate.

Nor
did McCarty have an option.  McCarty does not dispute how the lien would have
been identified on the commitment but answers that Montgomery still could not
force her to cure an encumbrance.  McCarty=s
obligation to provide clear title and the provision she contends limits
Montgomery=s remedies
are found in the following paragraph:

19. 
REPRESENTATIONS: Seller represents that as of the Closing Date (a) there will
be no liens, assessments, or security interests against the Property which will
not be satisfied out of the sales proceeds unless securing payment of any loans
assumed by Buyer and (b) assumed loans will not be in default.  If any
representation of Seller in this contract is untrue on the Closing Date, Buyer
may terminate this contract and the earnest money will be refunded to Buyer.

 

If the parties
had proceeded to closing, McCarty would have breached this provision by not
clearing the tax lien.  Montgomery, then, clearly had the right to terminate
the contract and receive a refund of his earnest money.  However, the contract
also contained a default provision, which read:

15.  DEFAULT: If
Buyer fails to comply with this contract, Buyer will be in default, and Seller
may (a) enforce specific performance, seek such other relief as may be provided
by law, or both, or (b) terminate this contract and receive the earnest money
as liquidated damages, thereby releasing both parties from this contract.  If,
due to factors beyond Seller=s
control, Seller fails within the time allowed to make any non-casualty repairs
or deliver the Commitment, or survey, if required of Seller, Buyer may (a)
extend the time for performance up to 15 days and the Closing Date will be
extended as necessary or (b) terminate this contract as the sole remedy and
receive the earnest money.  If Seller fails to comply with this contract for
any other reason, Seller will be in default and buyer may (a) enforce specific
performance, seek such other relief as may be provided by law, or both, or (b)
terminate this contract and receive the earnest money, thereby releasing both
parties from this contract.

 








McCarty contends
that this provision is inapplicable because an untrue representation is not
defined as a default.  McCarty directs our attention to a subsequent version of
the TREC Farm and Ranch contract (TREC No. 25-5) to support her argument. 
Because this is extrinsic evidence and because the parties do not contend that
their agreement is ambiguous or not fully integrated, we may not consider or
draw any inference from it.  McCarty also argues that, because the
representation paragraph is a specific provision and the default paragraph is a
general one, we should give preference to the specific provision.  That,
however, is a canon of construction applicable only when two or more reasonable
readings of a contract remain in irreconcilable conflict after applying the
rules of interpretation.  See Glasser, 49 Baylor L. Rev. at 683, 686.

The
representation paragraph=s
language does not indicate that the parties intended termination to be
Montgomery=s exclusive
remedy if McCarty failed to deliver clear title.  For example, it does not
contain language such as Aexclusive@ or Asole@
remedy.  Instead, termination is described permissively, ABuyer may terminate this
contract.@  We
recognize that the mere presence of the word Amay@ is not determinative.  For
example, if the paragraph had provided that buyer may choose one of three
options in the event of a false representation, this would indicate that
Montgomery=s remedies
were limited to those three options.  However, the representation paragraph
contains no such list.  We appreciate McCarty=s
argument that implicit within the paragraph=s
language is the choice of accepting the title offered or terminating the
contract, but this interpretation is inconsistent with the construction of the
remainder of the contract.

There
are three contractual provisions to consider and, if possible, to harmonize. 
Paragraph 6 provides a mechanism for determining and insuring title,[5]
Paragraph 15 lists the remedies for defaults by either party, and Paragraph 19
defines McCarty=s
representations at closing and provides at least a partial description of
Montgomery=s remedies
for a misrepresentation.  We have previously noted that McCarty was required to
deliver title free and clear of the tax lien without any predicate action by
Montgomery.  The significance of this is that, if the lien were a title-related
issue Montgomery was required to object to and if his objection were not cured,
the contract provides:  A[T]his
contract will terminate and the earnest money will be refunded to Buyer unless
Buyer waives the objections.@









By
specifying a mandatory remedy for title-related matters requiring an objection,
the import is that matters not requiring an objection will be treated
differently.  This is not an illogical distinction.  McCarty made limited
representations concerning her title.  The contract provided a process to
clarify what McCarty owned and was conveying.  If that process revealed
title-related issues and if the parties were unable to reach an agreement on
their resolution, termination is consistent with the notion that there was not
a meeting of the minds in the first instance.  However, delivery of title free
and clear of any third-party lien is substantively different because McCarty
specifically represented that any such lien would be cleared at closing.  The
parties identified a remedy for breach of this representation, but unlike the
objection provision, (Paragraph 6.D.), they did not describe it as exclusive. 
And unlike the default provision, (Paragraph 15), the representation paragraph
does not enumerate a list of options and require a choice amongst them.

Montgomery
could have terminated the contract, but because this was not his exclusive
remedy, he was also entitled to the default paragraph remedies, including
specific performance.  This interpretation gives meaning to each of the
contract=s provisions,
is consistent with the intent of the parties as expressed in the agreement as a
whole, and is consistent with the surrounding circumstances.  First, McCarty
may not have had actual knowledge of the IRS lien on her property when she
signed the contract and represented that clear title would be delivered at
closing, but she did have constructive knowledge since that lien was part of
her chain of title.  Second, the contract provided a place to list exception
documents.  Any listed document would be a permitted exception in the title
policy and would not be a basis for objection to title.  McCarty could,
therefore, have conditioned the purchase upon Montgomery=s assumption of the tax lien.  Third, if we
accept McCarty=s
construction, then any seller who has a change of heart after signing a
contract need only pledge their property as collateral for some other
obligation prior to closing.  The buyer would then be forced to assume this new
debt or terminate the contract, and the seller would have no fear of recourse.

The
trial court did not err by finding that specific performance was a permissible
remedy.

C. 
Was the Contract Unenforceable?








McCarty
argues that, regardless of what remedy might be available, the contract is
unenforceable because of a lack of mutuality and because it is an option
contract.  The contract allowed Montgomery to cancel the agreement if McCarty
was Adetermined to own
less than an undivided one half (2)
of the oil, gas, and other minerals in, on, and under the land above described.@  McCarty contends that
Montgomery knew Trimont had acquired a portion of the property by adverse
possession and, therefore, that McCarty did not own one-half of the minerals. 
Because Montgomery had the unilateral right to cancel the agreement, his
obligations were illusory.  Alternatively, his unilateral right to cancel made
the agreement an unenforceable option agreement. 

A
contract must be based upon valid consideration.  Light v. Centel Cellular
Co. of Tex., 883 S.W.2d 642, 645 (Tex. 1994), modified by Alex
Sheshunoff Mgmt. Servs., L.P. v. Johnson, 209 S.W.3d 644 (Tex. 2006).  An
illusory promise of performance invalidates a bilateral contract.  Light,
883 S.W.2d at 645.  A promise is illusory when if fails to bind the promisor
who retains the option of discontinuing performance.  Id.  In fact, an
illusory promise is no promise at all.  See 1 Arthur Linton Corbin, Corbin on Contracts ' 1.17 (rev. 1993).

Montgomery=s promises were not
illusory.  Trimont owns property contiguous to McCarty=s.  Prior to Trimont or McCarty acquiring
their interests, a fence was installed between their tracts, but it was not
located on the boundary line.  Instead, the fence cut diagonally across the
boundary line.  Montgomery testified that Trimont may have acquired a portion
of McCarty=s property
through adverse possession and, conversely, that McCarty may have acquired a
portion of Trimont=s
property through adverse possession.

The
contract=s use of the
word Adetermined@ suggests more definitive
or official action than Montgomery=s
own personal thought process; nonetheless, he merely recognized this as a possibility. 
By proceeding with the sale, he and McCarty were resolving a potential title
dispute and were both waiving the right to claim title by adverse possession to
any portion of the other=s
property.  The agreement, therefore, was supported by adequate consideration. 
The trial court did not err when it granted Trimont=s motion for summary judgment on specific
performance and when it denied McCarty=s
motion for summary judgment.

D. 
Did the Trial Court Erroneously Describe the Property to be Conveyed?

The
contract described the property as follows:

Undivided half (50%)
interest in both the surface and the mineral estates in the following described
land:  950.3 Acres consisting of 170.3 Acres in Abstract 2057 TR 1-1 C Melton,
140 Acres in Abstract 2073 TR 2-1 BL Caudill, and 640 Acres in Abstract 1057 TR
1-1 Poitevent.

 

The trial court ordered McCarty
to convey the following property:

 








Annette McCarty=s undivided one-half (50%)
interest in the surface and mineral estates in and to 950.3 acres located in
Palo Pinto County, Texas, consisting of 170.3 Acres in Abstract 2057 TR 1-1 C
Melton, 140 Acres in Abstract 2073 TR 2-1 BL Caudill (which 140 acres includes
all of the J.M. Morton & R.H. Morton Survey, A-2187, containing 41.5 acres,
more or less), and 640 Acres in Abstract 1057 TR 1-1 Poitevent.

 

The difference
between the two descriptions is the parenthetical in the judgment referencing
41.5 acres in the Morton Survey.  McCarty argues that the trial court=s judgment requires the
conveyance of an additional forty-one acres.  Strictly speaking, McCarty cannot
be correct.  The contract conveys an undivided 50% interest in 950.3 acres, and
the judgment requires McCarty to convey an undivided 50% interest in 950.3
acres.  The question is whether the 140 acres in Abstract 2073 described in the
contract is the same 140 acres in Abstract 2073 described in the judgment.

There
is no evidence that McCarty owns more than 140 acres in Abstract 2073.  In her
deposition, she was asked:

Q.        Okay. 
After inheriting the -- well, let me ask, is that -- is this the only property
you own in Palo Pinto County, or do you own any other property in Palo Pinto
County?

 

A.        That=s the -- that=s all.

 

Q.        Okay. 
And as you understand it, it=s
approximately 950 acres?

 

A.        Yes.

 

McCarty accuses
Montgomery of misrepresenting to this court that the contract covered all of
the real property she owns in Palo Pinto County, and she contends that her
testimony was only a general discussion that did not inquire into the property
described in the contract.  We agree that McCarty=s
testimony was part of a general discussion but disagree with her conclusion. 
Her testimony is clear that the 950 acres she inherited from her grandmother is
the only property she owns in Palo Pinto County.  Because she agreed to sell
950.3 acres, it follows that the contract conveyed all of her Palo Pinto County
real property.

McCarty
correctly points out that, subsequent to the contract=s execution, Montgomery attempted to amend the
contract=s property
description.  Montgomery sent Hortenstine a letter and offered to amend the
contract by increasing the down payment from $55,000 to $70,000 in exchange for
lengthening the term of the note from 12 to 15 years.  Montgomery also wrote:








In
the contract there was an irregularity in the description of the Caudill Survey
area which resulted from a vacancy on the East that was patented to the Morton
Bros. AND from some of the survey on the North having been sold off to H.C.
Moore et ux, the parents of Mrs. Edna Crumpton.  These matters have been
discussed with Neal Grantham, and I see no need to meet Thursday A.M.
(tomorrow) after all.

 

The letter
included a proposed contract amendment.  That document contained a property
description.  Rather than organized by abstract, the description was organized
by tract.  Tract One was the 640 acres in Abstract 1057, and Tract Two was the
170.3 acres in Abstract 2057.  Tracts Three and Four were described as:

THIRD TRACT: 
All of the J.M. Morton & R.H. Morton Survey, A-2187, containing 41.5 acres,
more or less.

 

FOURTH TRACT: 
99.5 acres, more or less, out of the B.L. Caudill Survey (sometimes called W.L.
Ainsworth Survey), A-2073, and being all of said survey, SAVE AND EXCEPT the
portion heretofore sold off to H.C. Moore and wife, Mary Moore, by E.B. Pickard
et al.

 

If the
correctness of the property description were decided by summary judgment, this
would be sufficient evidence to create a fact question.  The contract
references 140 acres in Abstract 2073, but the proposed amendment refers to
only 99.5 acres, the third tract is described by a survey and abstract not
contained in the contract, and the third and fourth tracts constitute 141 acres
B one more than
described in the contract.  However, Montgomery=s
letter does not establish that McCarty owned additional, unconveyed property;
the trial court did not use this property description; and McCarty=s position does not account
for the trial court=s
hearing to enter judgment.








After
the trial court granted Trimont=s
motion for summary judgment seeking specific performance, it held an
evidentiary hearing to determine attorney=s
fees and the manner in which the contract should be performed.  The property
description was not discussed during that hearing.  The trial court ruled on
attorney=s fees,
discussed the closing process, and asked the parties to work on an agreed
judgment.  The parties were unable to reach an agreement.  Montgomery prepared
a proposed judgment, and McCarty objected, contending that the judgment=s property description was
inconsistent with the contract=s
property description.  McCarty also asserted that she had not contracted to
sell all of her property in Palo Pinto County, and she objected to any order
requiring her to do so.  The trial court held another hearing and then entered
a final judgment.  That hearing was not transcribed, but the trial court made
findings of fact and conclusions of law.  The trial court found that Trimont
presented the court with copies of maps, field notes, and ad valorem tax
records reflecting that the 140 acres in Abstract 2073 includes all of the
41.5-acre Morton Survey.  Accordingly, the trial court found that these 41.5
acres were included in the contract=s
property description.

McCarty
disputes whether a subsequent hearing was held, contending that there is no
record of one.  There is no transcript from that hearing, but the record
confirms that the trial court did hold a hearing in chambers on June 28.  On
June 5, McCarty=s
counsel wrote Montgomery=s
counsel and advised him that the hearing on entry of judgment had been moved
from June 8 to June 28.  On June 28, McCarty=s
counsel sent Montgomery=s
counsel another letter and said: AI
received your proposed Final Judgment by fax.  I reviewed it in light of the
Judge=s statements
today in chambers.@ 
Finally, the trial court=s
findings of fact reflect that a hearing was held in chambers on June 28.

The
trial court did not err when it described the property to be conveyed.  The
record adequately supports the conclusion that the property conveyed in the
contract and the property described in the judgment are the same and that the
additional language referencing the Morton Survey merely clarified the property=s description.

E. 
Findings of Fact.

McCarty
next complains that the trial court=s
findings of fact are not supported by the evidence.  After the trial court
entered its final judgment, McCarty requested findings of fact and conclusions
of law regarding the trial court=s
hearing to determine attorney=s
fees and the equitable manner for specific performance.  The trial court
entered findings of fact and conclusions of law, but most of those dealt with
matters covered in the subsequent hearing to enter judgment.  McCarty complains
that these additional findings have no support in the record because the docket
sheet and final judgment contain no reference to a hearing or decision made at
the conclusion of that hearing.








The
trial court was not required to contemporaneously document any conclusions
reached at the June 28 hearing.  The judgment and findings of fact indicate
that the court considered evidence on the appropriate property description at
this hearing.  We cannot review the sufficiency of this evidence because no
record was made.  Tex. R. App. P.
13.1 requires the court reporter to make a full record of all proceedings and
to take all exhibits offered in evidence, unless excused by agreement of the
parties.  The trial court=s
findings indicate that both parties waived a record.  If that is correct,
McCarty may not complain now about the adequacy of the evidence offered during
that hearing.  See Long v. Long, 144 S.W.3d 64, 69 (Tex. App.CEl Paso 2004, no pet.).  If
that is incorrect, McCarty was required to object to the lack of a court
reporter by filing a motion or other written objection.  Reyes v. Credit
Based Asset Servicing & Securitization, 190 S.W.3d 736, 740 (Tex. App.CSan Antonio 2005, no
pet.).  Because no objection was made, any error was waived.

F. 
McCarty=s
Affirmative Claims for Relief.

McCarty
contends that the trial court erred by granting summary judgment on her
affirmative claims for relief because she presented sufficient evidence to
create questions of fact.  McCarty alleged that Montgomery intentionally caused
her to suffer extreme emotional distress when he accused her of criminal
misconduct and when he obtained an affidavit from her by misrepresentation. 
McCarty testified that, during a conversation, Montgomery Aasked me about the oil and
gas lease.  He asked me if I signed it, and I said, >Yes,=
and he said, >That=s criminal.=@  She later met with Montgomery and his
attorney at Luby=s. 
During this meeting, she was given an affidavit.  She read it and signed it but
contended that Montgomery and his counsel misrepresented what the affidavit
said about Montgomery=s
right to move forward with the closing.  McCarty testified that she was led to
believe that she and Hill Operating had done something criminal by signing the
oil and gas lease.  She testified that this has caused her to worry.  She
described her situation as being Ain
a constant emotional turmoil about B
or not constant, but periodic turmoil about it.@

McCarty=s testimony is insufficient
to create a fact question on either liability or damages.  The elements of an
intentional infliction of emotional distress claim are (1) the defendant acted
intentionally and recklessly, (2) the conduct was extreme and outrageous, (3)
the defendant=s
actions caused the plaintiff emotional distress, and (4) the plaintiff=s emotional distress was
severe. Twyman v. Twyman, 855 S.W.2d 619, 621-22 (Tex. 1993).  It
is for the court to determine in the first instance whether conduct is extreme
and outrageous.  Creditwatch, Inc. v. Jackson, 157 S.W.3d 814, 817-18
(Tex. 2005).  Extreme and outrageous conduct is conduct so outrageous in
character and so extreme in degree as to go beyond all possible bounds of
decency and to be regarded as atrocious and utterly intolerable in a civilized
community.  Id.  Generally, insensitive or rude behavior, insults,
indignities, threats, annoyances, and petty oppressions do not rise to the
level of extreme and outrageous conduct.  GTE Sw., Inc. v. Bruce, 998
S.W.2d 605, 612 (Tex. 1999).  McCarty=s
evidence, even when viewed in her favor, does not rise to the level of extreme
and outrageous conduct required to constitute a cause of action.








The
requirement that the emotional distress be severe means that the distress is so
severe that no reasonable person could be expected to endure it without
undergoing unreasonable suffering.  Id. at 618.  This requires proof of
more than mere worry, anxiety, vexation, embarrassment, or anger. Id. 
Because McCarty testified to no more than periodic turmoil, she also failed to
establish compensable damages.  The trial court did not err by granting summary
judgment on her intentional infliction of emotional distress claim.

McCarty
also asserted claims for misrepresentation and tortious interference with
contract.  McCarty claimed that the affidavit Montgomery filed in the real
property records of Palo Pinto County concerning the purchase agreement
misrepresented the status of title, caused her to lose her tax exemption, and
prevented her from selling her property.  She also claimed that Montgomery
executed an agreement with Hill Operating that voided and released the lease
agreement between herself and Hill Operating.

McCarty
cites no evidence that Montgomery made any representation to the taxing
authorities.  McCarty also cites no evidence that Montgomery=s actions, as opposed to
the tax lien, prevented her from selling the property to any other party. 
Because we have found that Trimont was entitled to specific performance, any
representation about its ability to proceed to closing was, in fact, true.  The
trial court, therefore, did not err by granting summary judgment on McCarty=s misrepresentation cause
of action.

McCarty=s tortious interference
claim is predicated upon a letter agreement between Montgomery and Hill
Operating.  They agreed that, when Montgomery became entitled to McCarty=s interest, her leases
would become void, be released, and be replaced with a new agreement.  McCarty
argues that this constitutes tortious interference with contract because it
interferes with her leases with Hill Operating.  We disagree because the letter
agreement is predicated upon Montgomery becoming entitled to McCarty=s interest.  Until then, it
has no impact on her rights under the mineral leases. The trial court did not
err by granting summary judgment on McCarty=s
tortious interference cause of action.

Finally,
McCarty asserted a cause of action for slander of title.  This cause of action
is based upon the statement in Montgomery=s
affidavit that he had the right to insist upon specific performance of the
contract.  Because that statement is true, no cause of action for slander of
title lies, and the trial court did not err by granting summary judgment on it.

G. 
Attorney=s Fees. 









The
trial court awarded Trimont attorney=s
fees of $85,520.50 through trial and conditional awards in the event of an
appeal.  McCarty argues that the trial court abused its discretion with this
award because the evidence provided no segregation of the fees between the
parties and provided no evidence or insufficient evidence as to the segregation
of the attorney=s fees
between the various claims.

Trimont=s counsel testified that
reasonable and necessary attorney=s
fees through the summary judgment process were $65,115, that reasonable and
necessary attorney=s
fees in bankruptcy court proceedings were $24,349.50, and that reasonable and
necessary attorney=s
fees through his testimony were $1,056, for a total of $90,520.50.  Counsel
testified that McCarty had filed several counterclaims after Trimont filed suit
for specific performance but that he viewed these as an effort to defeat
Trimont=s ability to
recover for specific performance and that the issues were integrally related
and intertwined.  Counsel testified that approximately $5,000 of time was spent
dealing with the issues for which attorney=s
fees were not recoverable.  McCarty offered no evidence but asked the court to
take judicial notice from its experience as to reasonable and necessary
attorney=s fees.  The
trial court found that the claims were Aclose
to being inextricably intertwined. But in view of counsel=s efforts to segregate, and
in the exercise of caution, I=m
going to diminish the requested award by $5,000.@

A
determination of reasonable attorney=s
fees is a question for the trier of fact.  Stewart Title Guar. Co. v.
Sterling, 822 S.W.2d 1, 12 (Tex. 1991).  The amount of a fee award rests in
the sound discretion of the trial court, and its judgment will not be reversed
on appeal absent a clear abuse of discretion.  Cordova v. Sw. Bell Yellow
Pages, Inc., 148 S.W.3d 441, 446-47 (Tex. App.CEl Paso 2004, no pet.).  Even though the
appropriate standard of review is abuse of discretion, we may nevertheless
review a fee award for sufficiency of the evidence.  Stewart Title, 822
S.W.2d at 11.

When
legal services advance both recoverable and unrecoverable claims, the
associated fees need not be segregated.  Tony Gullo Motors I, L.P. v. Chapa,
212 S.W.3d 299, 313-14 (Tex. 2006).  The need to segregate fees is a question of
law, while the extent to which certain claims can or cannot be segregated is a
mixed question of law and fact.  Id. at 312-13.  The trial court was
well familiar with the issues, having presided over the parties= cross-motions for summary
judgment.  From our work on this appeal, it is apparent that McCarty=s affirmative claims are
intertwined with Trimont=s
right to specific performance.  The trial court did not abuse its discretion
when it found that all but $5,000 of Trimont=s
fees and expenses were recoverable.

 

 

 








                                                        IV. 
Holding 

The
judgment of the trial court is affirmed.

 

 

 

RICK STRANGE

JUSTICE

 

June 11, 2009

Panel consists of:  Wright, C.J.,

McCall, J., and Strange, J.









     [1]Palo Pinto County
Abstract Company was also named as a defendant, but it was dismissed before
filing an answer when it deposited the contract=s
earnest money into the registry of the court.





     [2]McCarty argues that
this was not a standard form and points to differences between it and a TREC
form she attached to her brief.  The parties utilized TREC No. 25-4 as their
base document and customized it.  The form McCarty attached to her brief is
TREC No. 25-5, a subsequent version of this form.  The Texas Real Estate
Commission revised this form again on June 30, 2008.  The current version is
TREC 25-6 and is available at
http://www.trec.state.tx.us/formslawscontracts/forms/forms‑contracts.asp.





     [3]The permitted
exceptions were:

1.  The standard printed exception for standby fees,
taxes and assessments.

2.  Liens created as part of the [seller financing].

3.  Reservations or exceptions otherwise permitted by
this contract or as may be approved by Buyer in writing.

4.  The standard printed exception as to marital
rights.

5.  The standard printed exception as to waters,
tidelands, beaches, streams, and related matters.

6.  The standard printed exception as to
discrepancies, conflicts, shortages in area or boundary lines, encroachments or
protrusions, or overlapping improvements.  Buyer, at Buyer=s expense, may have the exception amended to read, Ashortages in area.@





     [4]The
contract elsewhere provided that no survey was required.





     [5]For an example of
this provision in practice, see Fawcett, Ltd. v. Idaho Northern &
Pacific Railroad Co., No. 11-07-00154-CV, 2009 WL 1349988 (Tex. App.CEastland May 14, 2009, n.p.h.).